**In the Matter of James T. HARMON et al., Bankrupt.**

**McLEAN CATTLE COMPANY, INC., Plaintiff,**

v.

**CULTON, MORGAN, BRITAIN & WHITE, Defendant.**

**Bankruptcy No. 2–79–00133. Adv. No. 279–0003.**

United States Bankruptcy Court, N. D. Texas, Amarillo Division.

Dec. 24, 1980.

Don L. Patterson, Amarillo, Tex., for debtor.

Michael A. McConnell, Fort Worth, Tex., for plaintiff.

Daniel C. Stewart, Dallas, Tex., for the examiner.

Thomas J. Griffith, Lubbock, Tex., for Welch Grain Co.

## MEMORANDUM OPINION

BILL H. BRISTER, Bankruptcy Judge.

An order for relief was entered on October 16, 1979, on the application of James T. Harmon ("Harmon") under Chapter 11, Title 11, United States Code. The statement of affairs and the schedules reflect that Harmon had conducted business under a number of common names and styles. Corporate charters had been issued for some of the entities through which Harmon conducted business, including an entity named Progressive Beef Packers, Inc. Notwithstanding the fact that those corporate charters had been issued, Harmon has conceded that for the purposes of the Chapter 11 proceeding he was, in reality, conducting each of the businesses individually.

The primary activity of the business operated by Harmon under the name and style of Progressive Beef Packers, Inc. was slaughtering cattle under a contract with Sambo's Restaurant. On occasion, that operation purchased cattle from others for slaughter.

On September 26, 1979, approximately three weeks before the application for order of relief under Chapter 11 was filed by Harmon, McLean Cattle Company ("McLean") sold 70 heifers to Progressive Beef Packers, Inc. Harmon signed and delivered to McLean a check for the purchase price of the cattle in the sum of $36,983.15, dated September 26, 1979, and drawn on the account of Progressive Beef Packers, Inc. at The First National Bank in Canyon, Texas. The check was deposited by McLean in its account at American National Bank in McLean, Texas.

On October 15, 1979, the day before the application for relief under Chapter 11 was filed, McLean received notice that the check had been dishonored when presented for payment. The notice from the Bank reflected that there were not sufficient funds in the account to cover the check. McLean immediately gave written notice of dishonor as required by Title 7, United States Code § 196 for perfection of the interest of an unpaid cash seller of livestock in a statutory trust provided by the Packers and Stockyard Act, 1921. McLean also filed a copy of the notice with the Secretary of Agriculture and its representative immediately telephoned Harmon's attorney, Don Patterson, and notified him that the check given by Harmon for the purchase price of McLean's cattle was dishonored by the Bank.

McLean searched for assets subject to its statutory trust. It learned that the defendant law firm, of which Mr. Patterson was a member, had received an advance retainer of $25,000.00 on October 9, 1979. McLean filed this adversary proceeding, seeking to impress against that advance retainer the statutory trust provided for its benefit by the provisions of Title 7, United States Code § 196.

The Packers and Stockyards Act, 1921, was amended by Congress in 1976. The provision of the amendment with which this adversary proceeding is concerned is contained in § 196(b) which provides in pertinent part:

"All livestock purchased by a packer in cash sales, and all inventories of, or receivables or proceeds from meat, meat food products, or livestock products derived therefrom, shall be held by such

packer in trust for the benefit of all unpaid cash sellers of such livestock until full payment has been received by such unpaid sellers."

The legislative history of the amendment which created that statutory trust, including an analysis of the developing marketing patterns which necessitated creation of that trust, is detailed in 1976 U.S.Code Congressional and Administrative News 2267, 2279 et seq. The final catalyst which required the amendment to the Packers and Stockyard Act, 1921, was the 1975 bankruptcy of American Beef Packers. That failure left livestock producers in 13 states unpaid for a total of over $20 million dollars in livestock sales. Of particular concern to the livestock producers in the ABP bankruptcy was the fact that the bankrupt's principal source of financing, General Electric, stood ahead of them among the bankrupt creditors by virtue of its duly protected and perfected security interests in ABP's inventory, including the livestock and derivative products which the producer's had sold on a cash basis and for which they had not been paid. Congress, recognizing and balancing the needs of the packing industry to be able to obtain financing and of the producer to insure receipt of payment for his livestock sold in cash sales, amended the Act in 1976. Under the provision for the statutory trust no specific identification of the livestock or of the carcasses, meat, proceeds or receivables derived therefrom is required by the producer. Instead those proceeds are held in a floating pool in trust for the benefit of all unpaid cash sellers, each of whom is entitled to a pro rata share in settlement of his account. It is apparent from the legislative history and from the congressional debates that Congress intended by that amendment to insure that all unpaid cash sellers of livestock were eventually paid.

With that history in mind the issues presented in this adversary proceeding must now be considered. Initially, a determination must be made as to whether the advance retainer to cover legal services rendered and to be rendered is included in the proceeds of sale which are required to be held in the trust.

After Harmon purchased the 70 heifers from McLean they were slaughtered at the killing plant owned by Harmon in Friona, Texas. The carcasses, together with those from other livestock which Harmon had obtained—some from cash sales and some of which Harmon owned individually—were transported to K–Pac in Houston, Texas, for processing.

At the time of this transaction Harmon's financial collapse was imminent. Harmon had been represented by an attorney in Amarillo, Texas, who, finding some conflict in his representation, referred Harmon to Don Patterson, a member of the defendant law firm in Amarillo, Texas. According to the record, Harmon and Patterson met for the first time on October 2, 1979. Over the following two weeks, through October 16, 1979, the exhibited time records of Mr. Patterson, reflect that Patterson and Harmon conferred, or Patterson was otherwise engaged in rendering legal services to or on behalf of Harmon, a total of 63 hours.

Patterson recognized that Harmon's legal problems were complex. Harmon had been sued by Sambo's Restaurant. The Bank which had furnished primary financing was getting increasingly restless. There was a multitude of other legal complications. Patterson, recognizing that a considerable portion of his time was going to be spent during the following weeks on Harmon's affairs, requested an advance retainer of $25,000.00. Harmon had sent a large number of carcasses in different transactions to K–Pac for processing and knew that he had monies coming from that source as the different shipments were processed. He obtained wire-transfer instructions from Patterson and arranged for the retainer to be wire-transferred directly to the law firm from K–Pac from some of the monies owing.

On October 9, 1979, the defendant law firm received a wire-transfer of $36,993.60 directly from K–Pac. That wire-transfer was deposited in the law firm trust account, $25,000.00 was transferred for the retainer and the balance of $11,993.60 was subse-

quently delivered over to the examiner after the Chapter 11 proceeding was filed.

Those monies so wire-transferred by K–Pac to the defendant law firm are the monies against which McLean seeks to impress its trust. The sources of the proceeds which comprise the $36,993.60 transfer are the factors which complicate the resolution of the initial issue.

The evidence at the trial shows that none of the proceeds of the $36,993.60 transfer were from the McLean carcasses. $17,500.28 of that total represented proceeds from sale of meat from livestock owned by Harmon individually and were, therefore, not proceeds from livestock obtained from "cash sellers." The remaining $19,493.32 represented sale of meat from cash sales from Wheeler Feedyard and Randall County Feedyard. However, both Wheeler Feedyard and Randall County Feedyard had been paid for the cattle on the invoices supporting their portion of the sales proceeds. Therefore, none of the monies received by the law firm were in payment of meat from *unpaid* "cash sellers" [1] of cattle to Harmon, the packer.

The defendant law firm contends that the fact that no part of that wire-transfer represented proceeds of livestock from *unpaid* cash sellers is controlling and that there is no statutory trust in those monies. In support of its conclusion that the floating trust pool does not include proceeds of cattle for which payment has been made, defendant cites *In re Federal Packing Company of Florida*, Case No. 78–1492, BK CA–B, Adversary Number one (Bankr.Ct.S.D.Fla., April 23, 1979); *In re Frosty Morn, Inc.*, Case No. BK–77–31707 (Bankr.Ct. M.D. Tenn., August 31, 1978); and *Hedrick v. S. Bonaccurso and Sons, Inc.*, 466 F.Supp. 1025 (E.D.Pa.1978).

Language contained in each of the cited opinions verify defendant's contention. Each of those cases contains statements which indicate that the statutory trust consists of all cattle and meat purchased in cash sales for which payment has not yet been made, and the proceeds of such cattle and meat. In none of those cases, however, is that dicta necessary to resolution of the issues of the case. However, the fact that a statement might be dicta does not necessarily prevent it from being an accurate statement of the law. In order that the persuasive character of that dicta might be declared, further research for its source was made. The authority cited in those cases was examined for its impact on determining Congressional intent as to the components of the statutory trust.

Each of those cases appeared to base the statement on the response of the House Leader for the bill, Congressman Thone of Nebraska, to a question from Congressman Latta of Ohio. 122 Cong.Rec. 12867 (daily ed. May 6, 1976).

Mr. Latta: "Mr. Chairman, I would like to ask the gentleman to clarify a provision which appears on page 17, line 22, or perhaps I had better read the whole paragraph, which reads as follows:

"(b) all livestock purchased by a packer in cash sales, and all inventories of, or receivables or proceeds from meat, meat food products, or livestock products derived therefrom, shall be held by such packer in trust for the benefit of all unpaid cash sellers of such livestock until full payment has been received by such unpaid sellers.

I would like to ask the gentleman whether or not he is referring in 'all livestock purchased' to include livestock that may be paid for by the packer. Say he has livestock and say 50% of it has been paid for. Is the gentleman talking about 'all' in the context of the livestock that has not been paid for?"

Mr. Thone: "We are talking about 'all' in the context of what has not been paid for. But as a practical matter what will occur is that a 'floating trust' will exist to insure that unpaid livestock cash sellers are ultimately paid. It need not and should not prevent a packer from obtain-

---

1. In fact, McLean was the only cash seller of livestock who has not received payment. McLean is the only beneficiary of the floating pool.

ing a loan on his livestock, meat products and accounts receivable for normally the amount of unpaid cash sellers outstanding at any one time should not be very great."

Mr. Latta: "In all instances here in that particular section that applies?"

Mr. Thone: "That is correct."

The word "all" appears three times in § 196(b) and the precise question asked by Mr. Latta and the answer by Mr. Thone depends upon which "all" each of them was using. Assuming that Mr. Latta was asking the precise question which is the issue in this case—that is, is the statutory trust limited to livestock and proceeds of livestock from unpaid cash sellers—it is less than clear that Mr. Thone had in mind the same "all". It does appear from Mr. Thone's response, and from the written responses of Marvin L. McLain, Administrator of the Packers and Stockyard Administration, to specific questions presented to him by representative Thone, that there would be no need for any special segregation of current assets, that the trust attaches on livestock, inventories, receivables and proceeds to the extent of the amount owed to the unpaid cash sellers, that there would be no necessity for a determination of the amount of that trust except in situations, such as bankruptcy, where the interest of various claimants must be specifically determined, and that undoubtedly commingling was going to take place. The amendment requires the packer to keep certain books and records, and in the opinion of Congressman Thone and of the Administrator it would be a simple matter for an audit to reveal the extent of the interest of the unpaid cash sellers in those commingled assets.

It appears that the particular issue which is presently before the court was never mentioned in those congressional debates nor in the committee report. In this case the challenged monies, although belonging to Harmon, were wired directly to defendant from Harmon's debtor and never physically went through any of the accounts of Harmon. There was no actual commingling and only by torturing the facts to the breaking point could one argue that there was constructive commingling. For the purposes of this order I find that the challenged monies were never commingled with other assets of Harmon. Specifically the challenged monies were never commingled with proceeds of livestock or meat from unpaid cash sellers.

The issue, therefore, must be faced squarely. Did Congress intend that the statutory trust be comprised of livestock and proceeds of livestock from *all* cash sellers, paid and unpaid—as the Act specifically states—or is it comprised only of livestock and proceeds of livestock from *unpaid* cash sellers?

A basic rule of statutory construction is that a statute should be construed so that the purposes for which it is intended may be effectuated. The intent of Congress in providing for the statutory trust is apparent. It intended that all unpaid cash sellers will eventually be paid in full for their livestock. If that intent is to be realized and if the concept of a "floating pool" is to have any real meaning it is necessary to conclude that Congress intended the Act to mean exactly what it says, that is: "*All* livestock purchased by a packer in cash sales, and the proceeds therefrom, shall be held by the packer in trust for the benefit of all unpaid cash sellers." That means, therefore, that in the instant case $7,499.72 ($25,000.00 retainer less $17,500.28 from cattle owned by the debtor individually) was subject to the statutory trust before it came into the possession of the defendant law firm.

The next issue to be determined is whether the attorney had the requisite knowledge of the existence of the trust which mandates that those same funds were burdened with the trust after they came into defendant's possession. McLean contends that under the circumstances Patterson had to know about the existence of the trust against the monies he received. Patterson had represented other packers in the past and was cognizant of the existence of the Packers and Stockyards Act. However,

Patterson denied in his testimony that he had knowledge that there were any outstanding unpaid cash sellers of livestock. Harmon testified that he had told Patterson that he slaughtered cattle under contract with Sambo's Restaurant, but does not recall advising him that he also purchased cattle from others for slaughter. Harmon's problems were complex and involved many areas. He was being sorely pressed by Sambo's and by the Bank. Many other problems were more critical than was the insufficient funds check to McLean. There was no evidence whatsoever that the subject of the McLean check ever came up in the conferences between Harmon and Patterson. In my opinion Patterson did not know, and had no reason to know, that on October 9, 1979, when he received the wire-transfer that those funds might be subject to the statutory trust provided by the Act.

While Patterson did not have that knowledge on October 9, 1979, he conceded in his testimony that he did know about the trust on October 15 or October 16, 1979. The $25,000.00 which was a part of the wire-transfer to defendant was an advance retainer only. A written retainer agreement dated that same date evidenced the agreement and confirmed that the sum of $25,000.00 was deposited with defendant as an advance retainer on attorney's fees. Those monies, while lawfully held by defendant, were in reality the monies of Harmon until the fees were earned. A retainer applies against services as those services are rendered. Patterson did receive actual knowledge that an unpaid cash seller of livestock existed when he received a call from McLean on October 15 or on October 16, 1979. At that time the hours during which the law firm had rendered services to Harmon totalled 63 hours. Although the firm had earned some fees for their services by October 16, 1979, at least $7,499.72 of the $25,000.00 retainer had not been earned.

I conclude, therefore, that $7,499.72 of the funds which were transferred to defendant on behalf of Harmon were impressed with the statutory trust provided by the Packers and Stockyard Act, 1921, as amended, that defendant had the requisite knowledge of that trust before the final $7,499.72 had been earned, that McLean is the beneficiary of that trust and that McLean should recover the sum of $7,499.72 from defendant.

LET JUDGMENT BE ENTERED ACCORDINGLY.

The clerk is directed to file this memorandum opinion and to furnish a copy to each attorney of record and a copy to the attorney for the examiner.

